FILED IN CLERK'S OFFICE
U.S.D.C. -Atlanta

JUN 19 2007

By: [signature] James N. Hatten, Clerk
Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| JOHN BOBBY MCGEE,<br>Inmate # GDC 1106897,<br>     Plaintiff, | ::<br>::<br>::<br>:: | CIVIL ACTION NO.<br>1:04-CV-2303-TCB |
| v. | ::<br>:: | |
| JACKIE BARRETT,<br>Sheriff, Fulton County, in her<br>individual capacity,<br>JOHN H. EAVES,<br>Chairperson, Fulton County Board<br>of Comm'rs, in his official capacity,<br>CORRECTIONAL HEALTH<br>CARE SOLUTIONS, INC.,<br>     Defendants. | ::<br>::<br>::<br>::<br>::<br>::<br>::<br>::<br>:: | PRISONER CIVIL RIGHTS<br>42 U.S.C. § 1983 |

## ORDER AND OPINION

This action is currently pending on Plaintiff's individual-capacity claims

against Defendant Jacquelyn Barrett. Now before the Court are Defendant Jacquelyn

Barrett's Motion for Summary Judgment, with supporting brief and affidavit [Doc.

83], and Plaintiff's Objection thereto [Doc. 88]; Plaintiff's Motion for Continuance,

Abeyance and Enlargement of Time [Doc. 86]; and Plaintiff's Motion for Default

Judgement [Doc. 89]. Pursuant to Fed. R. Civ. P. 25(d)(1), the Clerk of Court is

**DIRECTED** to substitute John H. Eaves for Karen C. Handel in the style of this

case, as Mr. Eaves is the current Chairperson of the Fulton County Board of

Commissioners.

## I. PRELIMINARY MATTERS

Plaintiff has filed a motion for default judgment and a motion for a continuance. Although "default judgment is appropriate when a party . . . has failed to plead or otherwise defend" an action seeking affirmative relief, "judgment by default is a drastic remedy which should be used only in extreme situations." Mitchell v. Brown & Williamson Tobacco Corp., 294 F.3d 1309, 1316-17 (11th Cir. 2002) (internal quotations omitted); see Fed. R. Civ. P. 55. Defendant Barrett has not "failed to plead or otherwise defend" Plaintiff's lawsuit. Accordingly, default judgment against her is inappropriate. Plaintiff also seeks a continuance so that he may have time to retain counsel upon his impending release from state prison in June 2007. However, Plaintiff may retain counsel at any time, and a continuance to that purpose is not required.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the pleadings and other documents on file "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's

AO 72A
(Rev.8/82)

case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp.</u> <u>v. Catrett</u>, 477 U.S. 317, 322 (1986).  When considering a summary judgment motion, a court must "view the evidence and all factual inferences therefrom in the light most favorable" to the non-movant. <u>Burton v. City of Belle Glade</u>, 178 F.3d 1175, 1187 (11th Cir. 1999).  "A court need not permit a case to go to a jury, however, when the inferences that are drawn from the evidence, and upon which the non-movant relies, are implausible." <u>Cuesta v. School Bd. of Miami-Dade County</u>, 285 F.3d 962, 970 (11th Cir. 2002) (internal quotations omitted).  Morever, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (internal quotations omitted).

The movant bears the initial burden of demonstrating that summary judgment is warranted. <u>Apcoa, Inc. v. Fidelity Nat'l Bank</u>, 906 F.2d 610, 611 (11th Cir. 1990). The movant may do so by showing "that there is an absence of evidence to support

3

the nonmoving party's case." <u>Celotex</u>, 477 U.S. at 325.  Once the movant has

properly supported the summary judgment motion, the non-movant then must "come

forward with specific facts showing that there is a *genuine issue for trial*," i.e.,

that the evidence is sufficient to support a jury verdict in the non-movant's favor.

<u>Bailey v. Allgas, Inc.</u>, 284 F.3d 1237, 1243 (11th Cir. 2002) (internal quotations

omitted). <u>See also</u> <u>Chanel, Inc. v. Italian Activewear of Florida, Inc.</u>, 931 F.2d 1472,

1477 (11th Cir. 1991) (stating that "the non-moving party must come forward with

*significant, probative evidence*") (emphasis added).  "[C]onclusory assertions . . .

[without] supporting evidence are insufficient to withstand summary judgment."

<u>Holifield v. Reno</u>, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997).

### III.  CONTENTIONS OF THE PARTIES

**B.**     **Plaintiff's factual allegations**

**1.**     **Plaintiff's complaint, as amended**

In his complaint, filed on August 6, 2004, pursuant to 42 U.S.C. § 1983,

Plaintiff sought compensatory and punitive damages and injunctive relief, and

alleged that, since being admitted to the Fulton County Jail (the Jail) on June 8, 2004,

he had been housed in an area without adequate ventilation, causing him to be

constantly damp with perspiration and placing him at heightened risk for "another

4

stroke" or a "staph infection"; his meals had not conformed to the "heart healthy/diabetic" diet prescribed for him; and he had been subjected to inhumane conditions during three transfers to and from the courthouse. [Doc. 1 ¶¶ IV, V.] In an amended complaint and supporting brief, Plaintiff alleged that Jackie Barrett, Fulton County Sheriff (now former Sheriff Barrett), was well aware of the inhumane conditions at the Jail. [Doc. 30; Doc. 33; see also Doc. 35 (granting motion to amend complaint to add factual details).]

### 2.    Plaintiff's responses to Defendants' interrogatories

In response to Defendants' interrogatories, Plaintiff alleged the following medical conditions that were either caused or exacerbated by the conditions at the Jail and/or during court transport: (1) a "urinary tract problem," exacerbated by his failure to receive benign prostatic hyperplasia (BPH) medications, and, among other items of equipment, "a sufficient number of single use catheters"; (2) several pre-existing medical problems resulting from his "back/pelvic injuries," exacerbated by the medical personnel's "refusing appropriate analgesics," taking away his double mattress, refusing appropriate treatment for "pre-existing spinal stenosis," and refusing to schedule appointments for a neurologist, an orthopedist, a podiatrist, and/or a urologist; and (3) panic attacks – caused by the "extreme heat," "extreme

5

thirst," overcrowding, and lack of ventilation during court transport, with "prisoners screaming" and "passing out from heat exhaustion" – causing Plaintiff, *inter alia,* to feel claustrophobic and "about to jump out of his skin," to miss meals, and to require nutritional supplements and psychotropic medication to control his anxiety attacks. [Doc. 42, Ex. 4 (Pl.'s Resps. to Interrogs.) at 6-8.]  Plaintiff noted that Dr. Mosley – an employee of Correctional Health Care Solutions (a named but unserved Defendant herein) – treated Plaintiff at the Jail, but "was anti-Constitutionally constrained by the Defendants in his attempts" to do so.  [Id. at 8.]

Plaintiff also stated that "Defendants spurned the provision of cleansers, anti-bacterial and viricidal agents and/or disinfectants for Plaintiff and every other prisoner housed at the Jail," and "refused to provide tools" such as "brushes, mops, brooms, scouring pads, [and] trash bags."  [Id. at 9.]  Plaintiff claimed that the general neglect of sanitation matters and "constantly damp" conditions caused him to contract a bacterial infection on his buttocks, which took longer to heal than under normal conditions, and exposed him to "revolting smells [that] caused him significant problems holding down food."  Plaintiff attributes his "recurring outbreaks of staph like infections" to these conditions.  [Id. at 9-11.]

6

In November 2005, at the time when Plaintiff responded to Defendants' interrogatories, he was receiving seven distinct medications in state prison, for the following conditions: urinary tract infection, stroke prevention, hypertension, muscle spasms associated with stenosis and other injuries, pain, bi-polar disorder, and eating disorders. [Id. at 11-12.] Plaintiff acknowledged that his pre-existing bi-polar disorder "remained essentially asymptomatic" while he was housed at the Jail, but stated that "other mental problems such as phobias and irrational fears [emerged] due to the conditions [he] was subjected to while" at the Jail. [Id. at 13.] Plaintiff alleged that he was suffering from anguish, loss of sleep, and generalized distrust of people. [Id. at 15.] Plaintiff alleged that Sheriff Barrett, by her actions and omissions, failed to maintain the Jail's physical plant (its ventilation and cooling systems), personnel, medical department, and food service "in a safe, Constitutional and wholesome manner," and "allowed human beings to be transported to and from the courthouse in a manner [to which] even the lowliest of beasts are not subjected." [Id. at 16.]

### 3.   Plaintiff's deposition responses

Plaintiff was deposed on March 6, 2007, and gave the following testimony. [Doc. 85 (Pl.'s Dep.).] When asked to describe how he had been "injured as a result of what allegedly happened in 2004," Plaintiff stated that he is "unable to urinate

7

without catheterization" and suffers from "mood swings and claustrophobia and panic attacks, anxiety attacks." [Id. at 6-8.] Plaintiff first noticed the need for catheterization in the summer of 2004 and first became aware of mood swings and claustrophobia in November 2004, and he developed "rashes" in his lower extremities while at the Jail, due to the heat. [Id. at 8, 12.] At the time of the deposition, Plaintiff was taking medication for high blood pressure or hypertension; opioid analgesics for pain and a laxative due to the effects of the opioids; prostrate medication; and baby aspirin for stroke prevention (due to his stroke of thirty years previously). [Id. at 10-11.] Plaintiff acknowledged that he had received blood pressure medication while at the Jail, but noted that he had not received medication for his bi-polar disorder, which had been diagnosed in 1996, nor had he received pain medication for his stenosis, a double mattress or orthopedic shoe to alleviate the pain from various past injuries, or sterilization equipment for his catheters. [Id. at 13-18.]

The "air conditioning" and "fan" in 3 South 300 did not work from June to November 2004, when Plaintiff was housed at the Jail, and no portable fans were provided, although he did have access to ice water. [Id. at 19-20.] The toilets leaked, there was mold on the walls and ceilings, and cleaning supplies were not provided. [Id. at 21.] Although Dr. Mosley told Plaintiff that he had recommended

8

that Plaintiff see a neurologist and a podiatrist, Jail personnel never scheduled either appointment. Dr. Mosley "seemed like a good [person] . . ., but he was very limited, I suppose, in what he could do." [Id. at 28.]

Between June and September 2004, Plaintiff went to the holding cell at the courthouse seven times, and each time he was "packed in a room standing . . . for hours" and so "tightly constricted in this holding area" that, when he was given a sandwich and container of juice, ostensibly for lunch, he could not "bend over to sit [sic] the juice on the floor." [Id. at 31.]  In response to questions concerning the relief he seeks herein, Plaintiff stated "the only place I know to point the finger would be at Jacquelyn Barrett since she was the sheriff over that jail, and perhaps the county commissioners should have had a responsibility there also." [Id. at 39.]

## B.   Defendant's motion for summary judgment

### 1.   Defendant's statement of undisputed material facts

Defendant alleges the following undisputed material facts. [See Doc. 83-3 (Defendant Jacquelyn Barrett's Statement of Material Facts To Which There Is No Genuine Issues To Be Tried) (hereinafter Def.'s Facts); see also Doc. 83-2 (Def.'s Supp. Br.) at 3-8.]  Plaintiff was arrested on charges of forgery and financial identify fraud on June 8, 2004, and transported to the Jail, where he remained until November

9

2, 2004, when he was transferred to state prison.  [Def.'s Facts ¶¶ 1-2; see Doc. 83-4 (Amended Affidavit of Roland Lane)[1] (hereinafter Amended Lane Aff.) ¶ 5.] Defendant hired Roland Lane as Chief Jailer in 2003, and he was responsible for its daily operations during the time that Plaintiff was housed at the Jail.  [Def.'s Facts ¶¶ 4-5; Amended Lane Aff. ¶ 3.]  During that time, Plaintiff did not have a stroke. [Def.'s Facts ¶ 3; see Pl.'s Dep. at 11.]  Plaintiff filed two grievances, "one regarding his medicine and one regarding jail food service," but he "never filed a grievance with respect to the alleged court transport conditions, unsanitary living quarters and poor ventilation."[2]  [Def.'s Facts ¶¶ 33-34; Amended Lane Aff. ¶¶ 19-21.]

During the time period at issue here, "Jail Staff regularly met with contractors to discuss sanitation and maintenance issues."  [Def's Facts ¶ 6; Amended Lane Aff. ¶ 11.]  Each inmate at the Jail was responsible for maintaining the cleanliness of his living area and was provided with cleaning supplies for that purpose.  [Def.'s Facts

---

[1] Roland Lane's "amended" affidavit is generally a re-submission of his prior affidavit, filed in support of the previous summary judgment motion in this case, with certain additions regarding the efforts made to keep Jail inmates cool during the summer of 2004.  [See Doc. 42-2 (Lane Aff.).]

[2] The content of these grievances is discussed in greater detail *infra*. As noted in the Court's disposition of the prior summary judgment motion in this case, Plaintiff claims that he filed numerous other grievances while at the Jail. [See Doc. 58 at 21; see also Pl.'s Dep. at 26-29.]

¶¶ 7-8; Lane Aff. ¶ 28.]   Although "some areas of the jail . . . had mold" in the summer of 2004, testing revealed "no harmful mold," and the Jail was "sprayed and maintained with anti-fungal chemicals on a daily basis."   [Def's Facts ¶¶ 9-10; Amended Lane Aff. ¶ 13.]

In 2004, Fulton County was under contract with a private firm for the maintenance of the Jail's ventilation system, and work orders for the repair of any system malfunction were given priority status.  [Def.'s Facts ¶¶ 11-12; Lane Aff. ¶ 6.]  Because of the difficulties in "maintaining a static temperature and climate control for the comfort of the inmates" during the summer of 2004, the Jail's mechanical air handlers were adjusted manually each day.  Although "there were some areas of the jail that would get very warm at times," these areas "were bearable and were occupied by both inmates and staff," including the Chief Jailer.  To alleviate discomfort in the affected areas, "the Jail Staff placed large fans on the units, and water coolers with ice," and they left some doors open that otherwise would have remained closed.  [Def's Facts ¶¶ 13-20; Amended Lane Aff. ¶¶ 7-9.]

The group holding cells where inmates were placed in preparation for court transport were provided with ventilation, ice, a water cooler, and a toilet.  To maintain employee and public safety, inmates were transported under restraint.  "The

11

entire transport time to and from the courthouse, including the retrieving of inmates from cells, searching them and putting them on the bus, was approximately two hours. A water cooler was sent with the inmates on each bus. Once inmates arrived at the courthouse, they were unloaded and provided with water and toilets." [Def.'s Facts ¶¶ 21-25; Amended Lane Aff. ¶¶ 23-25.][3]

"It is the policy and practice of Fulton County for food vendors to provide inmates with meals from nutritionists [sic] certified menus," and, during the relevant time frame, "inmates were provided with meals approved by nutritionists." [Def.'s Facts ¶¶ 26-27; Amended Lane Aff. ¶¶ 26-27.] Finally, the medical contractor for the Jail "handled the treatment of all inmates as well as [the] prescribing and dispensing of all medications" during Plaintiff's incarceration there, and it is the "policy, procedure and custom" of the Jail "to rely solely on medical care providers to diagnose, treat and notify Jail personnel as to whether an inmate has medical problems requiring some action on the part of jail staff." [Def's Facts ¶¶ 28-31;

---

[3] Although Lane states that the "entire transport time to and from the courthouse . . . was approximately two hours," he also states that the retrieval process began at 5 a.m. and the buses were boarded "at about 7 a.m.," which appears to contradict his summary statement that the "entire" process required only two hours, as there is no indication how much time elapsed between the boarding of the buses and their being unloaded at the courthouse. [Amended Lane Aff. ¶ 23.]

AO 72A
(Rev.8/82)

Amended Lane Aff. ¶¶ 14-16.] Plaintiff received medication for his heart problems and hypertension while at the Jail. [Def's Facts ¶ 35.]

### 2.   Defendant's arguments

#### a.   The jail conditions did not violate the Eighth Amendment

Defendant argues that an Eighth Amendment conditions-of-confinement claim requires proof of "extreme deprivations," not proof of mere discomfort or even of "severe discomfort." [Def.'s Supp. Br. at 10-11 (citing Chandler v. Crosby, 379 F.3d 1278, 1298 (11th Cir. 2004)).] Defendant asserts that the prison conditions described in Plaintiff's complaint, although perhaps "uncomfortable," did not constitute extreme deprivations. [Id. at 12.] Noting that water coolers and ice were provided in the holding cells for inmates awaiting court transport and that toilets were provided at each end of the courthouse trips, Defendant argues that Plaintiff's "vague, generalized allegations" about overcrowding during court transport are constitutionally insufficient, especially because Plaintiff has not specified the time and place of the alleged violations. [Id. (Footnote omitted).] Defendant states that if inmates urinated on the transport buses, as Plaintiff alleges, they did so without her approval. [Id.] Further noting that "cleaning materials and supplies were provided to each inmate each morning," Defendant states that it was Plaintiff's own fault if his

13

cell was not clean. [Id. at 13.] In sum, Defendant asserts that because "Plaintiff was provided with food and access to water, toilets and cleaning supplies," he received everything required "to avoid the imposition of cruel and unusual punishment" under the Eighth Amendment. [Id. at 13-14.]

### b.   Defendant Barrett did not act with deliberate indifference

Next, Defendant argues that Plaintiff has failed to establish her deliberate indifference, i.e., he has failed to demonstrate that she not only was aware that Jail conditions created an inference of a substantial risk of serious harm to Plaintiff's health or safety, but she also drew that inference. [Id. at 14.] Defendant argues that she "would not have known that a weak air conditioning system amounted to an excessive risk to inmate health and safety." [Id. at 15.] She further argues that, in any case, the provision of fans and water coolers with ice, and the efforts of her staff at the Jail to correct the ventilation problems, demonstrate that she did not completely ignore the risk, but instead attempted to alleviate it. In other words, even if she did draw the inference of a substantial risk of serious harm to Plaintiff and his fellow inmates, she provided "a reasonable response" that satisfied her Eighth Amendment duties. [Id. at 15-16.]

14

Furthermore, noting that Plaintiff admits that he was receiving medication for his heart problem and hypertension from Jail personnel, Defendant argues that Plaintiff has failed to present evidence that he had an untreated serious medical condition while at the Jail, other than his self-diagnosed need for a catheter to help him urinate. [Id. at 17-18 (citing Pl.'s Dep. at 15).] Defendant asserts that Plaintiff's alleged fear that "other injuries or medical needs" would occur while at the Jail is insufficient to support an Eighth Amendment claim of deliberate indifference to a serious medical need. [Id. at 18.]

### c.    Defendant Barrett is entitled to qualified immunity

Finally, Defendant argues that she is qualifiedly immune from Plaintiff's claims because "Plaintiff cannot point to a single case which stands for the proposition that a jail that is hot and uncomfortable is violative of the Constitution," and, even if he could, he cannot show that a reasonable sheriff in Defendant's circumstances "would have understood that [her] decisions and discretionary acts concerning conditions at the jail violated the Constitution." [Id. at 22.] Defendant argues further that the Eleventh Circuit's affirmance in Crosby of summary judgment against Florida prisoners, who had alleged that the excessive heat in their cells violated the Eighth Amendment, would have led "a reasonable Sheriff to believe that

15

the allegations made by Plaintiff were already found not to be constitutional violations under the law of this circuit." [Id. at 23.] Defendant states that Plaintiff cannot show that she "was aware of any specific harm to Plaintiff or any widespread heat-related injuries at the jail for which she failed to take action." Instead, Plaintiff has only speculated about the potential dangers of the heat. [Id. at 24.]

## C.   Plaintiff's responses to Defendant's motion for summary judgment

In response to Defendant Barrett's summary judgment motion, Plaintiff relies upon his prior pleadings, which this Court discussed at length in its Order granting in part and denying in part the previous summary judgment motion in this case, filed jointly by Defendants Handel (now Eaves) and Barrett. [Doc. 88 at 1; see Docs. 42, 58.] Plaintiff asserts that Defendants have withheld "vital documents" from him, which allegedly contain "still more evidence" to support his claims. [Doc. 88 at 2-4; see Doc. 86 at 2-3.] Plaintiff rejects Defendant Barrett's qualified immunity defense, stating that she "mocks this Court[']s intelligence by attempting to make this Court believe that she had no knowledge of conditions at her Jail even though as Sheriff and overall Supreme Authority at Fulton County Jail, it [was] her job and clear legal duty to be aware of all conditions in her Jail and diligently monitor correction procedures instituted by her staff." [Doc. 88 at 2-3.] Plaintiff asserts that by

16

"conscious and intentional failure to act," Defendants repeatedly have failed to provide him with responses to his discovery requests, which Plaintiff submitted in accordance with the Federal Rule of Civil Procedure, and have "willfully and maliciously told untruths and evaded properly answering certain interrogatories." [Doc. 89 at 1-3.]

Of greatest significance in Plaintiff's prior pleadings is a letter that Dr. Robert B. Greifinger sent to the Office of the Fulton County Attorney on May 31, 2004, describing conditions at the Jail as Dr. Greifinger found them on May 26-27, 2004.[4] [Doc. 50 ¶¶ 2, 4.] Plaintiff also referred to a follow-up letter from Dr. Greifinger to the Court on July 12, 2004. [Id. ¶ 4.] The Greifinger Report and the July 12, 2004, letter indicated, among other things, that the air handling systems at the Jail were overburdened and breaking down; mold and mildew grew unabated on the walls and ceilings of the housing zones due to the excess humidity; and the breakdowns in the

---

[4] After his visit to the Jail on September 7-9, 2004, Dr. Greifinger described the Jail conditions again in a September 14, 2004, letter to the Court (hereinafter, along with the May 31, 2004, letter, "the Greifinger Report"). See Harper v. Bennett, Case No. 1:04-CV-1416-MHS (filed in this Court on May 19, 2004), Doc. 89 at 4 (Consent Order, entered December 21, 2005, noting the agreement of the parties, including Fulton County Commission Chairperson Handel and Fulton County Sheriff Freeman, that the Greifinger Report "provide[s] an adequate factual basis for the Court to assess the conditions at the Jail") & App. A (the Greifinger Report). The Greifinger Report is discussed in greater detail infra.

17

laundry facilities added to the humidity and unsanitary conditions.  Plaintiff stated

that "[t]here can be no doubt that the facts asseverated by Plaintiff are the same facts

observed and reported by Dr. Greifinger." [Id.]  Plaintiff acknowledged, however,

that neither the Greifinger Report nor the complaint in *Harper* addressed the

treatment of Jail inmates during court transport.[5]  [Id. ¶ 8.]

## IV.  DISCUSSION

### A.    The legal framework

To prevail on a claim for relief under 42 U.S.C. § 1983, a plaintiff must

establish that an act or omission committed by a person acting under color of state

law deprived him of a right, privilege, or immunity secured by the Constitution or

laws of the United States. See Hale v. Tallapoosa County, 50 F.3d 1579, 1582 (11th

Cir. 1995).  For there to be a violation of the Eighth Amendment constituting cruel

and unusual punishment, "[f]irst, there must be, objectively speaking, conduct by

---

[5]  Plaintiff also previously presented the affidavit of Mark Jackson, which
described the latter's incarceration at the Jail from November 2001 through February
2004. [Doc. 52 at 2.] Accordingly, Jackson has no personal knowledge of Plaintiff's
treatment.  However, Jackson described unsanitary conditions at the Jail, wet and
putrid air, "maggot food" served to the inmates, insufficient medical care, and horrid
conditions during court transfers, much of which is similar to the description of the
Jail in either the Greifinger Report or Plaintiff's complaint, as amended, or both. [Id.
at 2-4.]

public officials sufficiently serious to constitute a cruel or unusual deprivation – one denying the minimal civilized measure of life's necessities. Second, there must be a subjective intent by the public officials involved to use the sufficiently serious deprivation in order to punish." Taylor v. Adams, 221 F.3d 1254, 1257 (11th Cir. 2000) (citations and internal quotations omitted). "The 'cruel and unusual punishments' standard applies to the conditions of a prisoner's confinement," Crosby, 379 F.3d at 1288, and to the denial of inmate medical care, Taylor, 221 F.3d at 1257-58.

### 1.   Deliberate indifference to conditions of confinement

"[R]outine discomfort is part of the penalty that criminal offenders pay for their offenses against society," so that "extreme deprivations are required to make out a conditions-of-confinement claim." Hudson v. McMillian, 503 U.S. 1, 9 (1992) (internal quotations omitted). See also Wilson v. Seiter, 501 U.S. 294, 298 (1991) (noting that "[t]he Constitution . . . does not mandate comfortable prisons") (internal quotations omitted). Nevertheless, in order to prevail on an Eighth Amendment challenge to his conditions of confinement, a prisoner "need not await a tragic event before seeking relief, [but] he must at the very least show that a condition of his confinement poses an unreasonable risk of serious damage to his future health or

19

safety." Chandler, 379 F.3d at 1289 (citations and internal quotations omitted).

Moreover, "'a prison official cannot be found liable under the Eighth Amendment

for denying an inmate humane conditions of confinement unless the official knows

of and disregards an excessive risk to inmate health or safety; the official must both

be aware of facts from which the inference could be drawn that a substantial risk of

serious harm exists, and [s]he must also draw the inference.'" Id. at 1295 (quoting

Farmer v. Brennan, 511 U.S. 825, 837 (1994)).  See also Farmer, 511 U.S. at 847

(holding that prison official may be found liable "only if" she disregards "substantial

risk of serious harm" to inmates "by failing to take reasonable measures to abate it").

## 2.    Deliberate indifference to a serious medical need

The Eighth Amendment also prohibits indifference to a serious medical need

so deliberate that it "constitutes the unnecessary and wanton infliction of pain."

Estelle v. Gamble, 429 U.S. 97, 104 (1976) (internal quotations omitted).   To

demonstrate deliberate indifference, a plaintiff must show both "an objectively

serious medical need" and the defendant's subjective knowledge of, and more than

negligent disregard of, that need.  Farrow v. West, 320 F.3d 1235, 1245 (11th Cir.

2003). "A core principle of Eighth Amendment jurisprudence in the area of medical

care is that prison officials with knowledge of the need for care may not, by failing

to provide care, delaying care, or providing grossly inadequate care, cause a prisoner

to needlessly suffer the pain resulting from his or her illness." McElligott v. Foley,

182 F.3d 1248, 1257 (11th Cir. 1999).

### 3. Individual-capacity liability for a supervisor[6]

Moreover, because Plaintiff alleges, and it appears, that Defendant Barrett's

role in the constitutional violations alleged herein was as a supervisor of her staff at

the Jail, she may be held liable only on that basis. Noting the well-established rule

"that supervisory officials are not liable under § 1983 for the unconstitutional acts

of their subordinates on the basis of respondeat superior or vicarious liability," the

Eleventh Circuit has stated that, instead, a supervisor is individually liable only when

she "personally participates in the alleged unconstitutional conduct or when there is

a causal connection between [her] actions . . . and the alleged constitutional

deprivation." Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003). A plaintiff

can establish this causal connection by showing that the supervisor knew about and

failed to correct a widespread history of abuse or had a custom or policy that resulted

in a constitutional violation, or by showing that the "facts support an inference that

---

[6] Previously, this Court dismissed Plaintiff's official-capacity claims for damages against Sheriff Barrett and his claims for prospective relief against all Defendants. [See Doc. 58.]

21

the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." Id. (Internal quotations omitted). "The standard by which a supervisor is held liable in [her] individual capacity for the actions of a subordinate is extremely rigorous." Id.

### 4.   Qualified immunity from individual-capacity claims

"Qualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." Lee v. Ferraro, 284 F.3d 1188, 1193-94 (11th Cir. 2002) (noting that, "[b]ecause qualified immunity is a defense not only from liability, but also from suit, it is important for a court to ascertain the validity of a qualified immunity defense as early in the lawsuit as possible") (internal quotations omitted). To warrant qualified immunity, a public official must have been "acting within the scope of [her] discretionary authority when the allegedly wrongful acts occurred." Id. at 1194.

> Once the defendant establishes that [s]he was acting within [her] discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate. . . . As a "threshold question," a court must ask, "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"

22

Id. (Citation omitted).

"If a constitutional right would have been violated under the *plaintiff's* version of the facts, the court must then determine whether the right was clearly established." Id. (internal quotations omitted).  A right is clearly established when it would be clear to a reasonable official that her conduct is unlawful under the circumstances. Bashir v. Rockdale County, 445 F.3d 1323, 1330 (11th Cir. 2006).

> This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition. . . . The contours of the right must be sufficiently clear that a reasonable official would understand that what [s]he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

Id. at 1330-31 (citation and internal quotations omitted).  In general, to determine if a public official had "fair and clear notice" that her actions violated the Constitution, a court must examine "case law existing at the time of the violation" – "decisions of the U.S. Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state" – involving facts "similar to the case at hand."  Id. at 1331 & n.9.

> While materially similar precedent or broad statements of principle can unquestionably establish a right with sufficient clarity to deny an officer qualified immunity, they are not in all instances required to provide

23

> officials with the requisite notice. . . . [T]here are some instances where the conduct in question goes so far beyond the hazy border of constitutionally permissible behavior that an official should be denied qualified immunity even absent materially similar precedent.

Powell v. Barrett, 376 F. Supp. 2d 1340, 1351 (N.D. Ga. 2005) (Story, J.) (citations and internal quotations omitted).

**B.     The factual background**

**1.     The Greifinger Report**

Once again this Court takes judicial notice of the Greifinger Report, entered on the record as an appendix to the Consent Order in *Harper* on December 21, 2005.[7] The Fulton County Sheriff, Myron Freeman, and the Chairperson of the Fulton County Board of Commissioners, Karen Handel, sued therein in their official capacities, acknowledged that this report accurately described Jail conditions in May and September 2004. Id., Doc. 89 at 4. On May 26-27, 2004, Dr. Greifinger made his eighteenth visit to the Jail over the course of the preceding five years and "met with members of the jail staff, the medical staff, and counsel for Fulton County" to discuss his findings, which surprised no one – "it was generally acknowledged . . . that there are major problems at the Jail that make health care delivery extremely

_____

[7] Previously, the Court inadvertently stated that the Consent Order was entered on December 21, 2004. [See Doc. 58.]

24

difficult.  The dismal environmental conditions and poor maintenance at the Jail

were also recognized by everyone."  Id. App. A at 2.

Dr. Greifinger noted that "[i]t was very hot indoors" and that "[t]he

air-conditioning had been broken for days."  Id.  Dr. Greifinger also noted the

following:

> The maintenance staff cannot keep up.  They spend 90% of their
> time on repairs and only 10% on preventive maintenance. . . . The
> HVAC controls do not work.  There are leaking pipes throughout the
> facility, broken or missing security cameras, damaged ceiling tiles and
> overflowing toilets.  On 5 North, body heat alone uses more than 50%
> of the air-conditioning capacity. . . .
>
> The laundry is in crisis. . . . The inmates are washing their own
> underwear . . . . This is unsanitary.  The wet laundry further humidifies
> the air, already wet with perspiration from the crowding and the
> inadequate air handling equipment.

Id. at 4.  After noting that "the quality of medical care is good," although inhibited

"by security staff vacancies and faulty mechanical systems," Dr. Greifinger offered

a series of conclusions, including the following: "[t]he overcrowding is increasing";

[t]he housing units are unsanitary"; and "[t]he air-handling systems, plumbing, and

electrical systems cannot keep up due to crowding, poor construction and

underfunded maintenance."  Id. at 5-6.

25

On July 12, 2004, Dr. Greifinger sent a letter to the Court regarding his July 8, 2004, visit to the Jail.  Harper, Doc. 35.  In that letter, Dr. Greifinger stated that there was "no substantial change" in the overcrowding and deficient maintenance, and "essentially no improvement in the environmental conditions: crowding, heat, humidity, sanitation, hygiene, tension."  Id. at 1-2.  Dr. Greifinger noted the following:

> The air-conditioning controls are broken; the main buss has failed since my last visit.  There is a vicious cycle of daily failures because of the crowding, inadequate air-handling systems, and inadequate moisture control.  Areas of the jail have no cooling.  The humidity is high and the growth of mold on the room surfaces and ceiling tiles continues unabated as a result of the excessive humidity.

Id. at 1.  Dr. Greifinger also noted that "[t]he quality of health care remains acceptable, to the extent that inmate patients can get to see the health care staff."  Id. at 3.

After his September 7-9, 2004, visit to the Jail, Dr. Greifinger reported in his September 14, 2004, letter that there was "a noticeable change at the facility" since its takeover by a court-appointed receiver "one month ago."[8]  Harper, Doc. 89, App.

_____

[8] The Court takes judicial notice that Sheriff Barrett was relieved of her duties at the Jail on or about July 25, 2004.  See "Sheriff bounced in scandal," Wash. Times, July 25, 2004 (reporting that the Governor of Georgia suspended Sheriff Barrett "only hours after a retired federal prison administrator was sworn in to take

26

A at 8.   However, Dr. Greifinger noted that, despite the improvements in maintenance, "[t]he heat index in the building regularly exceeds 90 in areas where the air-conditioning is not working.  This is dangerous, especially for those who are vulnerable to heat injury such as those with chronic diseases and those on certain medications . . . ."  Id. at 9, 11.

## 2.   The administrative record

Attached to Chief Lane's original affidavit in this case are copies of two Inmate Grievance Forms that Plaintiff submitted while at the Jail.  [Doc. 42, Lane Aff., Ex. B.]  In the first grievance, dated June 30, 2004, Plaintiff complained about the discontinuation of his allocation of "metamucil twice daily to avoid bleeding hemorrhoids"; his receipt of a stool softener once, instead of twice, daily; and his "having to use [a] catheter to empty [his] bladder."  [Id., Ex. B at 3.]  On July 15, 2004, the "CQI Coordinator" responded to Plaintiff's complaints by detailing Plaintiff's medical history while at the Jail and noting that he had been given all of his requested medications and had "not been forced to use the catheters."  [Id. at 4.]  On August 4, 2004, the grievance officer reported that Plaintiff "states that he is now receiving the proper treatment," and Plaintiff acknowledged his agreement with that

———————————————

charge of the overcrowded" Fulton County Jail).

assessment by signing the form on that date.[9]  [Id. at 3.]  On July 19, 2004, Plaintiff

submitted a second grievance, complaining that "white bread, sugar, white rice,

potatoes, [and] noodles" should not be served to diabetics such as himself because

"these foods rank high on [the] glycemic index."  [Lane Aff., Ex. B at 7.]  The

registered dietician for the Jail responded, on September 9, 2004, that "[i]t is within

standard for you to receive carbohydrates within moderation."  [Id. at 8.]

**B.    Plaintiff's Eighth Amendment claims**

**1.    Excessive heat and humidity**

In assessing Defendant's assertion of qualified immunity from Plaintiff's

claims regarding excessive heat and humidity, the Court must address the following

three issues: (1) whether Defendant was exercising discretionary authority in

supervising the Jail, (2) whether her conduct violated Plaintiff's constitutional rights,

and (3) whether the constitutional violation was clearly established in the relevant

caselaw at the time of the alleged violation.  See Lee, 284 F.3d at 1193-94; Bashir,

445 F.3d at 1330-31.

---

[9]    Although Plaintiff claims that he filed numerous other grievances with
respect to conditions at the Jail, including grievances regarding his medical treatment
[see Doc. 48 ¶ 4; Doc. 58 at 11-12], he has never denied that the resolution of the
grievance under discussion here accurately reflects the status of his medical
treatment as of August 4, 2004.

### a.   Defendant's exercise of discretionary authority

It is undisputed that Sheriff Barrett was exercising her discretionary authority in administering the Jail. See Purcell v. Toombs County, 400 F.3d 1313, 1316 (11th Cir. 2005) (reversing denial of summary judgment to Georgia Sheriff who claimed qualified immunity from suit arising from inmate-on-inmate attack at county jail).

### b.   Constitutional violation

Although the Eleventh Circuit held in Crosby that the prisoners' claims therein, alleging excessive heat, did not make out an Eighth Amendment violation, the Court notes several differences between the factual allegations in Crosby and those here. Most significantly, in Crosby, the district court found that "the relative humidity in the building rarely [rose] above seventy percent, the humidity level needed to support the growth of mold and mildew," and "on average, inmates . . . may have experienced temperatures over ninety degrees nine percent of the time during the months of July and August 1998 and July of 1999." Crosby, 379 F.3d at 1285-86. According to the Greifinger Report, however, there was significant growth of mold and mildew on the walls and ceilings of the housing zones at the Jail, due to the excessive humidity and, even after the improvements in maintenance in late summer 2004, "[t]he heat index in the building regularly exceed[ed] 90 in areas

29

where the air-conditioning [was] not working," a condition that Dr. Greifinger considered dangerous for inmates with chronic diseases. [Doc. 50 ¶ 4; Harper, Doc. 89, App. A at 9, 11.]

The Greifinger Report speaks for itself. Based on that Report, which Plaintiff incorporated into his pleadings, this Court concluded that Plaintiff's version of events creates, at a minimum, a genuine issue of material fact as to whether the excessive heat and humidity at the Jail rose to the level of a constitutional violation. [See Doc. 58.] See also Crosby, 379 F.3d at 1294-95 (stating that "the Eighth Amendment applies to prisoner claims of inadequate cooling and ventilation," that "a prisoner may state an Eighth Amendment claim by alleging a deficiency as to either condition in isolation or both in combination," and that "[a] condition which might not ordinarily violate the Eighth Amendment may nonetheless do so if it persists over an extended period of time") (internal quotations omitted); Lee, 284 F.3d at 1194 (stating that, for qualified immunity purposes, the existence of a constitutional violation is judged based on "*Plaintiff's* version of the facts").

c.    **Clear notice to Defendant of a constitutional violation**

Defendant relies upon the Crosby holding to establish her qualified immunity. [Def.'s Supp. Br. at 23-24.] However, as noted *supra*, Defendant Barrett was no

longer Sheriff of Fulton County on August 6, 2004, the date when the Eleventh

Circuit published its opinion in Crosby and, coincidentally, the date when Plaintiff

filed the instant complaint. Accordingly, Crosby is irrelevant to determining whether

Defendant had "fair and clear notice" that the actions or failures to act at issue here,

all of which occurred prior to Crosby's publication, violated the Constitution.  See

Bashir, 445 F.3d at 1331.

    Nevertheless, as noted above, it is Plaintiff's burden "to show that qualified

immunity is not appropriate."  Lee, 284 F.3d at 1194.  This he has not done.  The

caselaw in force at the time of Defendant's actions did not place her on "fair and

clear notice" that the failure to abate conditions of high heat and humidity would

violate the Eighth Amendment.  In Chandler v. Baird, 926 F.2d 1057, 1065-66 (11th

Cir. 1991), the leading case on extreme prison temperatures prior to Crosby, the

Eleventh Circuit held "that the right of a prisoner not to be confined in a cell at so

low a temperature as to cause severe discomfort and in conditions lacking basic

sanitation was well [enough] established in 1986. . . . [to deprive defendants]

summary judgment on the basis of qualified immunity."  In Crosby, however, the

Eleventh Circuit distinguished its holding in Baird, stating that the Baird court "was

concerned entirely with the law related to excessive cold claims; [and] had no

31

opportunity to treat an excessive heat or inadequate ventilation claim." <u>Crosby</u>, 379 F.3d at 1296.

Accordingly, this Court concludes that, in the absence of a prior ruling that prison conditions of extreme heat and humidity violated the Constitution, Defendant was not on "fair and clear notice" that the allegedly excessive heat and humidity at the Jail, in and of themselves, constituted a potential Eighth Amendment violation. <u>See Lee</u>, 284 F.3d at 1194 (ruling that qualified immunity "protect[s] from suit all but the plainly incompetent or one who is knowingly violating the federal law") (internal quotations omitted). Moreover, this Court cannot conclude that the general requirement that prison officials provide inmates with "the minimal civilized measure of life's necessities," <u>Taylor</u>, 221 F.3d at 1257, is "a general constitutional rule . . . [that applied] with obvious clarity to the specific [conditions] in question" here, <u>see</u> <u>United States v. Lanier</u>, 520 U.S. 259, 271 (1997) (discussing similarity between qualified immunity standard and "fair warning" standard applicable in 18 U.S.C. § 242 criminal prosecutions for alleged violations of victim's constitutional rights). Defendant Barrett is entitled to qualified immunity from Plaintiff's claims regarding the heat and humidity at the Jail during the relevant timeframe – June and July 2004, prior to Defendant's removal from her position at the Jail.

32

### 2.    Court transport

Plaintiff alleges that Defendant Barrett's "chain-of-command was made aware of the particular abuses [he] was being subjected to" during court transport, but "she chose to do absolutely nothing, even in the face of multiple lawsuits over the very same conditions." [Pl.'s Resps. to Interrogs. at 16.] Defendant does not argue that she is protected from this claim by qualified immunity. [See Def.'s Supp. Br. at 19-24 (asserting qualified immunity only with respect to Plaintiff's claims regarding excess heat).] Plaintiff has alleged that he experienced inhumane conditions for long periods of time during court transport – for example, Plaintiff and other inmates were made to wait in hot and crowded conditions for so long that some "prisoners pass[ed] out from heat exhaustion," and later, at the courthouse, Plaintiff and his fellow inmates were tightly "packed in a room standing . . . for hours." [Pl's Resps. to Interrogs. at 7; Pl.'s Dep. at 31.]

Given Plaintiff's allegations, the Court cannot conclude that there is no genuine issue of material fact regarding (1) whether the conditions Plaintiff experienced during court transport while Defendant was Sheriff were so inhumane as to violate the Eighth Amendment prohibition against cruel and unusual punishment, (2) whether Defendant was deliberately indifferent to these allegedly

33

inhumane conditions, and (3) whether there was a causal connection between Defendant's actions, or failure to act, and the alleged violations. See Mathews v. Crosby, 480 F.3d 1265, 1270 (11th Cir. 2007) (noting that "[t]he Constitution does not . . . permit inhumane" prisons). The Court notes that, to support her summary judgment motion, Defendant relies almost exclusively upon the Amended Affidavit of Roland Lane, which is, in most respects, including court transport, virtually identical to his original affidavit. [Compare Lane Aff. ¶¶ 13-17 with Amended Lane Aff. ¶¶ 22-25.] This reliance seems misplaced, given legitimate questions regarding the accuracy of assertions in both of Lane's affidavits. [See Doc. 58 at 31-32 (questioning Lane's apparent lack of awareness of problems with Jail sanitation and ventilation during the summer of 2004, as set forth in his original affidavit).][10] [Compare Amended Lane Aff. ¶ 13 (acknowledging apparently minor problem with mold in "some areas of the jail") with Harper, Doc. 35 (July 12, 2004, letter from Dr. Greifinger) at 1 (describing "unabated" growth of mold on "room surfaces and

_____

[10] Although Lane attempts to explain this "oversight" based on his alleged confusion over the dates of Plaintiff's incarceration at the Jail, the Court finds this explanation less than convincing. [See Amended Lane Aff. ¶ 2 (indicating that, at the time he prepared his original affidavit, Lane believed that Plaintiff's incarceration at the Jail began on August 8, 2004, not June 8, 2004, even though the two grievances that Lane discussed in his original affidavit, and attached thereto, were submitted by Plaintiff to Jail personnel on June 30, 2004, and July 19, 2004).]

34

ceiling tiles" "throughout the building," and expressing opinion, based on prior tests, that mold was highly likely to be "one of the few molds that is toxic to humans").] Defendant's failure to provide more specific support for her summary judgment motion with respect to Plaintiff's court transport claims, such as affidavits from court transport officers during the relevant time period, weighs heavily against her.

### 3.   Medical care, diet, and cell sanitation

As for the remainder of Plaintiff's claims against Defendant Barrett, it is undisputed that she was on clear notice that deficiencies in medical care, diet, and cell sanitation can violate the Eighth Amendment and, therefore, that she is not entitled to qualified immunity from Plaintiff's claims regarding these conditions. [See Def.'s Supp. Br. at 14 (acknowledging that a Sheriff acquits herself of her Eighth Amendment duties by furnishing "prisoners with reasonably adequate food, clothing, shelter, sanitation, medical care, and personal safety" (quoting Harris v. Thigpen, 941 F.2d 1495, 1511 (11th Cir. 1991))).] In fact, as noted *supra*, Defendant has not argued that she is protected from these claims by qualified immunity.

Nevertheless, the administrative record, set forth *supra*, reveals no genuine issue of material fact regarding Plaintiff's claims that, as of the end of July 2004, when Sheriff Barrett was relieved of her duties at the Jail, his medical care and meal

35

service were constitutionally deficient.  On August 4, 2004, Plaintiff acknowledged

his agreement with the assessment that he was "receiving the proper treatment" for

his medical problems, including all of his requested medications [Lane Aff., Ex. B.

at 3-4], and Plaintiff has not disputed the accuracy of that assessment.  Accordingly,

summary judgment in favor of Defendant is proper with respect to Plaintiff's medical

care claims.  See, e.g., Harris, 941 F.2d at 1504-05 (stating that as long as medical

treatment is "minimally adequate," prisoner's preference for different course of

treatment does not give rise to constitutional claim).  Moreover, in the Greifinger

Report, upon which Plaintiff relies for much of his factual support, Dr. Greifinger

acknowledged that, with some limitations, "the quality of medical care [at the Jail]

is good."  Harper, Doc. 89, App. A at 5-6.

Furthermore, Plaintiff's claims with respect to his medical care and diet are

based, for the most part, on the proposition that Sheriff Barrett was the "Supreme

Authority" at the Jail [see Doc. 88 at 2], which amounts to *respondeat superior* and

cannot be the basis for supervisory liability.  See Cottone, 326 F.3d at 1360 (noting

"extremely rigorous" standard for supervisory liability).  Here, there is insufficient

evidence to overcome this "extremely rigorous" threshold in support of an inference

that, with respect to Plaintiff's medical care and meal service, Defendant either knew

36

about and failed to correct a widespread history of abuse, had a custom or policy that resulted in a constitutional violation, or knew that her subordinates would act unlawfully and failed to stop them from doing so.

On the other hand, Plaintiff's claims regarding the sanitation of his jail cell are not ripe for summary judgment in favor of Defendant Barrett. Plaintiff alleges that the sanitation supplies at the jail were inadequate or non-existent. Given the poor state of Jail sanitation described in the Greifinger Report, Defendant's contrary assertion that supplies were provided to Plaintiff does not demonstrate the lack of a genuine issue of material fact with respect to this claim. Nor, given the apparently widespread nature of the sanitation problem, is it apparent that Defendant may not be held liable in her supervisory capacity for the alleged violations, which may have contributed to the growth of mold at the Jail and resulted in an unreasonable risk to Plaintiff's health. See Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999) (stating that "[i]f the record presents factual issues, the court must not decide them; it must deny the [summary judgment] motion and proceed to trial").

## V. CONCLUSION

Accordingly, for the foregoing reasons, Defendant Jacquelyn Barrett's Motion for Summary Judgment [Doc. 83] is **GRANTED IN PART** and **DENIED IN**

AO 72A
(Rev.8/82)

**PART**.  Plaintiff's claims against Defendant Barrett alleging excessive heat and humidity, inadequate medical care, and deficient meal service are **DISMISSED** from this action.  Plaintiff's claims against Defendant Barrett regarding court transport and cell sanitation will **PROCEED** further.

Plaintiff's Motion for Continuance, Abeyance and Enlargement of Time [Doc. 86] and Motion for Default Judgment [Doc. 89] are **DENIED**.

The pretrial order is due no later than July 19, 2007.  No extensions of time will be granted.

**IT IS SO ORDERED**, this 19th day of June, 2007.

TIMOTHY C. BATTEN, SR.
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)